HILARY POTASHNER (Bar No. 167060)
Federal Public Defender
ERIN MURPHY (Bar No. 285087)
(E-Mail:  Erin_Murphy@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone:  (213) 894-2854
Facsimile:  (213) 894-0081

Attorneys for Defendant
ADAU AKUI ATEM MORNYANG

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> ADAU AKUI ATEM MORNYANG, <br><br> Defendant. | Case No. 19-CR-00050-CJC <br><br> **REPLY TO GOVERNMENT'S OPPOSITION TO MOTION FOR DISMISSAL OF THE INDICTMENT OR, ALTERNATIVELY, A NEW TRIAL; DECLARATION OF COUNSEL; EXHIBIT** <br><br> **Hearing Date:  June 17, 2019** <br> **Hearing Time:  9:00am** |

By and through her counsel of record, Deputy Federal Public Defenders Erin Murphy and Georgina Wakefield, Ms. Adau Mornyang hereby replies to the government's Opposition to her Motion for Dismissal of the Indictment or, Alternatively, A New Trial.  (ECF Nos. 89, 93.)  This Reply is based on the attached memorandum of points and authorities, declaration and exhibit, all pleadings and records in the matter, and any further argument this Honorable Court might require.

/ / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

HILARY POTASHNER
Federal Public Defender

DATED:  May 24, 2019

By  */s/ ERIN MURPHY*

ERIN MURPHY
Deputy Federal Public Defender
Attorney for ADAU MORNYANG

By  */s/ GEORGINA WAKEFIELD*

GEORGINA WAKEFIELD

Deputy Federal Public Defenders
Attorneys for ADAU MORNYANG

ii

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

The government was required to establish that the slap alleged in Counts 1 and 2 occurred somewhere that supports venue here.  The only evidence on that point came from the alleged victim, a flight attendant of 22 years.  He testified that, at the relevant time frame, the plane was most likely near Hawaii.  That does not support venue here.  To avoid this conclusion, but having done nothing to confirm the location of the alleged slap, the government offers four theories for why venue is proper here.  None of these theories escape controlling law that requires the government to prove where the assault occurred.  Because the government failed to do so, venue was not proper here.

The government also failed to authenticate the only evidence purporting to come directly from Ms. Mornyang, an audio recording made by an unknown person at an unidentified time.  Untethered to any foundation, and yet graphically prejudicial, the government's repeated reliance on that recording requires a new trial.

## II.   ARGUMENT

**A.    The government failed to prove that venue is proper in this district.**

**1.    There was no waiver because the Indictment did not allege where the alleged slap occurred.**

The government argues that this Court should not consider this argument because the defense waived it.  (Gov't Opp., ECF No. 93 at 4–6.)  According to the government, the defect in venue was apparent on the Indictment's face, and, thus, the defense was required to raise the issue before the government finished its case-in-chief.  (*Id.* at 4.)

The defect was not apparent on the face of the Indictment.  (*See* ECF No. 17.)  The Indictment only alleged that, while on an aircraft, Ms. Mornyang "knowingly assaulted" (Count 1) and "intentionally [struck and beat]" Mr. Gutierrez "by slapping him in the face with her hand" (Count 2).  (*Id.* at 1–3.)  Although the Indictment indicated where the plane landed, it did not specify where that slap occurred.  (*Id.*)

1

1      Thus, no reasonable reader of the Indictment could have surmised where the

2 alleged slap occurred, the defect at issue here.  With scant other allegations in the

3 Indictment, but accepting the allegations as true, venue was ostensibly proper here.  For

4 that reason, it does not matter that the Indictment "makes clear that the basis for venue

5 was the fact that the plane landed" in this district.  (Gov't Opp., ECF No. 93 at 5.)  The

6 Indictment itself gave no hint that this was incorrect.

7      Nor does it matter what any discovery suggested about where the alleged slap

8 occurred.  As in *United States v. Lozoya*, such revelations are "immaterial, since 'only

9 the indictment may be considered in pretrial motions to dismiss for lack of venue, and

10 the allegations must be taken as true.'"  *Lozoya*, 920 F.3d 1231, 1238 (9th Cir. 2019)

11 (quoting *United States v. Mendoza*, 108 F.3d 1155, 1156 (9th Cir. 1997)).

12     **2.**     **The government failed to support venue here under any**

13               **applicable venue statute.**

14      The government appears to offer four theories to support venue here:  three rely

15 on 18 U.S.C. § 3238, and the fourth relies on 18 U.S.C. § 3237(a).  Each theory fails.

16     **a.**     **Ms. Mornyang was arrested long before she arrived in Los**

17               **Angeles.**

18      Under 18 U.S.C. § 3238, for offenses "begun or committed on the high seas, or

19 elsewhere out of the jurisdiction of any particular state or district," venue is proper

20 where "the offender . . . is arrested or is first brought."  "Venue is a question of fact"

21 for the jury to find.  *United States v. Lukashov*, 694 F.3d 1107, 1120 (9th Cir. 2012).

22      The government concludes here, without citing any fact, that Ms. Mornyang was

23 arrested in Los Angeles.  (Gov't Opp., ECF No. 93 at 1, 7.)  Mr. Jason Jay testified that,

24 immediately after the alleged slap, he seized Ms. Mornyang, and then handcuffed her.

25 (Trial Day 1 Tr., ECF No. 80 at 94:4–23.)  The government acknowledged this during

26 its closing argument.  (Trial Day 2 Tr., ECF No. 78 at 117:21–23.)  Mr. Mornyang was

27 not arrested in Los Angeles because she was already arrested hours before that.  At no

28 time was she released.  This theory of venue under § 3238 fails.

**b.      The government did not prove where the offense occurred.**

The government's second theory of venue under § 3238 fails, too.  The only testimony about where the alleged slap occurred came from Mr. Gutierrez, who the government characterized as a "veteran flight attendant" of 22 years.  (Trial Day 2 Tr., ECF No. 78 at 106:25.)  He testified that, at the relevant interval of the flight, they were "most likely" near or close to Hawaii.  (Trial Day 1 Tr., ECF No. 77 at 57:9–20.)

The government insists that "this testimony establishes" that the plane had not yet reached Hawaii.  (Gov't Opp., ECF No. 93 at p. 7.)  It does not.  The government's argument assumes the very fact that the government failed to prove—*where* the alleged slap occurred.  The government does not contest that, for venue purposes, this is the critical question for assault charges.  *See Lozoya*, 920 F.3d at 1239.  The government did not answer this question for the jury.  It is not enough for the government to assume for its own benefit what "close to Hawaii" means, or where the plane was at the critical moment.  If the alleged slap did not occur over Hawaii, and on the high seas as the government suggests, the government offered no fact to support that conclusion.  The government cannot meet its burden by pointing to a fact it never established.

Even accepting the government's assumption that the alleged slap did not occur immediately above Hawaii, that assumption also forgets that a plane need not be directly above Hawaii in order to be within its jurisdiction.  As confirmed by the Office of Coast Survey, the U.S. Maritime Limits and Boundaries for Hawaii extend significantly beyond the islands themselves.  (Decl. of Erin Murphy, ¶2, Ex. A.)

Without any other evidence about when or where the alleged slap occurred, the jury had only Mr. Gutierrez's testimony as a "veteran flight attendant" about where the plane was at the relevant time.  The government failed to clarify or confirm at all where the alleged slap occurred.  As a result, the jury heard insufficient evidence to conclude that the alleged slap occurred on the high seas.  (Trial Day 1, ECF No. 80 at 57:9–11.)

Indeed, the need for such evidence was critical here exactly because, as in *Lozoya*, there is another district where venue is evidently proper.  Had the plane here

3

1   traveled across an area that consisted entirely of high seas, or foreign jurisdictions, a
2   jury could perhaps conclude that the offense must have occurred outside the jurisdiction
3   of the United States.  That was not the case here.  The government failed to prove
4   venue was proper here under § 3238.  This is true for both Counts 1 and 2.

5              **c.    Count 1 does not charge a continuing offense.**

6          The government seeks to distinguish Count 1 from Count 2 because Count 1
7   charged "interference with the flight attendant," which the government appears to
8   characterize as an offense that continued into an area that would furnish venue here.
9   (Gov't Opp., ECF No. 93 at 8.)  That is incorrect.

10         To start, § 3238 is not premised on whether an offense continued into another
11  jurisdiction.  That theory of venue arises from § 3237, which, as discussed further
12  below, does not apply here either.  Section 3238 concerns offenses "begun or
13  committed upon the high seas, or elsewhere out of the jurisdiction of any particular
14  State or district[.]"  18 U.S.C. § 3238.  Whether the offense might also be a continuing
15  offense under § 3237 does not change that, in order for § 3238 to apply, the government
16  must still prove where the offense began or was committed.  As discussed above, the
17  government failed to do that.

18         Regardless which statute the government relies on for this theory, Count 1 did
19  not charge a continuing offense for venue purposes.  As observed in *Lozoya*, the
20  Supreme Court held in *United States v. Rodriguez-Moreno*, 526 U.S. 275, 278 (1999),
21  that venue constitutionally arises from where the offense was committed.  *Lozoya*, 920
22  F.3d at 1238–39.  Per *Rodriguez-Moreno*, the answer to this question is twofold:  the
23  nature of the crime, and the location of the act or acts constituting the crime.
24  *Rodriguez-Moreno*, 526 U.S. at 278.  Here, the only essential conduct element in Count
25  1 is the assault, i.e., *how* Ms. Mornyang allegedly interfered with Mr. Gutierrez.  While
26  interference is an element, it is a circumstance element satisfied by the *crew members'*
27  actions, i.e., an element "after the fact of an offense begun and completed by others."
28  *United States v. Stinson*, 647 F.3d 1196, 1204 (9th Cir. 2011) (quotations and citation

1  omitted).  Here, then, any interference was "subsequent activity [that] was incidental
2  and therefore irrelevant for venue purposes."  *Lozoya*, 920 F.3d at 1239.

3       This is in contrast to offenses that involve continuing offense conduct.  For
4  example, possessing drugs while on an airplane is a continuing offense because the
5  individual's offense conduct itself continues for as long as the drugs are in transport.
6  *See United States v. Barnard*, 490 F.2d 907, 912 (9th Cir. 1973) ("A jury could find
7  that the possession and the intent existed when the plane crossed the border into the
8  Southern District of California, and continued while the plane crossed that district and
9  flew into the Central District, where it landed.  Thus, venue could be laid in either
10  district."); *see also Stinson*, 647 F.3d at 1204 (finding VICAR charge alleging murder
11  in one district was a continuing offense into another district because the Indictment
12  alleged that the defendant aided, abetted, and otherwise participated in the murders in
13  that other district).  Thus, continuing offense conduct is not dependent on a separate
14  *actus reus*.  Rather, the offense is an inherently continuous one.  Here, we know that
15  interference of a flight attendant is an incidental element because, without the assault—
16  the essential offense conduct—any interference is no offense at all.

17       Meanwhile, to support its theory that Count 1 is a continuing offense, the
18  government cites only to *United States v. Hall*, 691 F.2d 48, 50 (1st Cir. 1982).  *Hall* is
19  not helpful.  There, the court held that "the offense continues for at least as long as the
20  crew are responding directly, and in derogation of their ordinary duties, to the
21  defendant's behavior."  *Id.* at 50.  Even accepting that interpretation of 49 U.S.C. §
22  46504,[1] the charge and the passenger's behavior in *Hall* were meaningfully different.
23  There, the passenger struck more than one flight attendant, he "tried to force his way
24  into the pilot's cabin" and he "threatened several times to blow up the airplane."  *Hall*,
25  691 F.2d at 49.  "The airplane's officers, stewardesses, and his fellow passengers
26  restrained him on several occasions, but after each period of calm, he resumed his

----

28      [1] In *Hall*, the court analyzed 49 U.S.C. § 1472, an apparent predecessor to §
46504, the charge in Count 1.

obstreperous conduct." *Id.*  As a result, "[t]he pilot diverted the flight, making an unscheduled landing in" the charging district.  *Id.*  Though the passenger "sat quietly in his seat" while flying over the charging district, the court found that venue was proper there.  *Id.*  The court reasoned that the "interference" at issue under the statute could arise from "an assault, an act of intimidation, or a threat," and the diversion of the flight clearly "interfered" with the flight crew's duties.  *Id.* at 50.

Here, though, the government's theory under Count 1 was explicitly limited to a single alleged assault.  Thus, any continuing "interference" must be, per *Hall*, in direct response to that alleged assault.  The government asserts broadly that Ms. Mornyang's "interference was comprised of her course of disruptive behavior, including the slap with lasting effects." (Gov't Opp., ECF No. 93 at 8.)  The government does not specify those "lasting effects."  (*Id.*)  If the government is relying on Ms. Mornyang's alleged behavior *after* the marshals arrested her, the government does not explain how that behavior disrupted Mr. Gutierrez's duties "for the remaining five hours of the flight." (*Id.*)  This connection is essential because Count 1 alleged that the purported slap only impacted Mr. Gutierrez's duties.  (Indictment, ECF No. 17 at 1–2.)  In *Hall*, the government alleged that the passenger "did assault, intimidate and threaten flight crew members and flights attendants[.]" *Hall*, 691 F.2d at 49.  There, the court pointed to myriad assaults, threats, and acts of intimidation that required direct responses from various crew members.  *Id.* at 50.  Most significant, the diversion of the flight to and over the charging district was itself the pilot's direct response to the passenger's threats. At most here, the government states that Mr. Gutierrez "could not prepare services for the other passengers for the remainder of the flight." (Gov't Opp., ECF No. 93 at p.7.) However, Mr. Gutierrez's testimony reveals that this was not because of the alleged slap, but because Mr. Mornyang was allegedly "demeaning" *other* crew members and the marshals.  (Trial Day 1 Tr., ECF No. 80 at 38:25–39:12.)  Even under *Hall*, this does not establish where any interference of Mr. Gutierrez's duties occurred, let alone that it occurred somewhere furnishing venue here.

6

Also, *Hall* is a 37-year-old case from another circuit.  Applied as the government seeks to apply it here, *Hall* conflicts with *Lozoya*.  First, to the extent that the government argues that *Hall* held that § 46504 is always a continuing offense, *Lozoya* requires a more nuanced approach which, as described above, reveals that the essential offense conduct was the alleged slap.  Second, in *Hall*, the court rejected the notion that the government must prove "precisely where [the] threats and assaults took place, in a plane traveling across many states at great speed, high above the earth.  Such an interpretation would often make [the predecessor statute to § 46504] difficult to enforce—precisely the opposite of Congress's intention in passing it, and the related venue section."  *Hall*, 691 F.2d at 50.  In *Lozoya*, the Ninth Circuit found the opposite:

> However valid these questions and the practical concerns that underlie them might be, they are insufficient to overcome the combined force of the Constitution, *Rodriguez-Moreno*, and our own case law.  These authorities compel our conclusion: that the proper venue for an assault on a commercial aircraft is the district in whose airspace the alleged offense occurred.

*Lozoya*, 920 F.3d at 1242.

These authorities compel the same decision here.[2]

### d.    Count 1 is not a transportation or foreign commerce offense.

The government finally argues that 49 U.S.C. § 46504, charged in Count 1, is a continuing offense under 18 U.S.C. § 3237(a).  (Gov't Opp. at 8.)  Because the alleged misconduct involved a flight attendant on a commercial airline, the government concludes that the instant charge under Count 1 "directly implicated interstate or foreign commerce."  (Gov't Opp. at 8 (quoting 18 U.S.C. § 3237(a).)  That is not enough under to confer venue under § 3237(a).

---

[2] The court's reasoning in *Lozoya* also disposes of the government's other argument that venue here is proper because it is not unfair to Ms. Mornyang.  (Gov't Opp., ECF No. 93 at 9–10.)  As the court concluded in *Lozoya*, the venue requirement is mandated by the Constitution, deep issues of public policy, and existing case law.  "[F]airness" does not confer venue in a district where the government failed to prove that venue exists under statutory or Supreme Court law.

7

To start, merely implicating interstate or foreign commerce is not enough.  Under § 3237(a), that an offense involves an airplane does not automatically make it a transportation or commercial offense.  Section 3237(a) provides:

> Any offense *involving the use of* the mails, transportation in interstate or foreign commerce, or the importation of an object or person into the United States is a continuing offense and . . . may be . . . prosecuted in any district from, through, or into which such commerce, mail matter, or imported object or person moves.

18 U.S.C. § 3237(a) (emphasis added).

The provision plainly concerns only those offenses "*involving the use of* the mails, transportation in interstate or foreign commerce, or the importation of an object or person[.]" *Id.* (emphasis added).  Thus, the offense itself must inherently exploit transportation, commerce, or importation of persons or things.  *See, e.g.*, *United States v. Hankish*, 502 F.2d 71, 73 (4th Cir. 1974) (finding venue available under transportation provision of § 3237(a) where charges included transporting stolen merchandise and a stolen vehicle, and transporting stolen beer in interstate commerce); *United States v. Kapordelis*, 569 F.3d 1291 (11th Cir. 2009) (finding that transporting and producing depictions of children engaging in sexual conduct is a continuing crime involving "the use of the mails, transportation in interstate or foreign commerce" where the punishment is tied "to the transport of the visual depictions or the means of producing those visual depictions in interstate or foreign commerce"); *United States v. Beech-Nut Nutrition Corp.*, 659 F. Supp. 1487, 1494 (E.D.N.Y. 1987) (interpreting "[t]he operative word in section 3237 [as] 'involving', the term to involve being defined as 'to include as a necessary circumstance'" and so "[a]ny offense which included transportation as a necessary circumstance is a continuous crime" under § 3237, like the introduction of misbranded foods into interstate commerce).

That an assault interfered with a flight attendant's duties does not make it a transportation or commercial offense.  The government cites no case interpreting § 3237(a) so broadly.  If the government's interpretation of § 3237(a) is correct, then it is unclear why the court in *Hall*, which concerned interference with a flight crew on an

8

airplane, went to such lengths to analyze the offense as a continuing one.  *See Hall*, 691 F.2d at 49–50.  If interference of a flight crew member is truly an offense "involving *the use of* the mails, transportation in interstate or foreign commerce," then the second paragraph of § 3237(a) would have neatly resolved the issue altogether.

The Ninth Circuit also rejected this reasoning in *Lozoya*.  There, the magistrate found that "to establish venue, the government only needs to prove that the crime took place on a form of transportation in interstate commerce."  *Lozoya*, 920 F.3d at 1235. Declining that approach, the court held that "although the assault occurred on a plane, the offense did *not* implicate interstate of foreign commerce" under § 3237(a).  *Id.* at 1240 (emphasis in original).  Specifically, "the conduct constituting the offense was the assault, which had nothing to do with interstate commerce."  *Id.*  This reasoning is equally forceful here, even though Count 1 concerns assault that interfered with a flight attendant.  As noted above, the essential conduct was the alleged slap.  Any interference was not a conduct element, but an incidental or circumstantial element that is irrelevant to venue.  *See id.* (citing *Stinson*, 647 F.3d at 1204; *United States v. Auernheimer*, 748 F.3d 525, 533 (3d Cir. 2014) (observing difference between "circumstance element" of money laundering—i.e., the criminally generated proceeds—from the defendant's essential offense conduct, i.e., the laundering acts, only the latter of which can support venue)).  That it occurred on an airplane is, at most, a "*jurisdictional* element," which "does not convert the offense to one that involves transportation[.]"  *Lozoya*, 920 F.3d at 1240 (emphasis in original).

Because this was not a continuing offense, nor an offense involving the use of transportation in interstate commerce, these theories for venue fail, too.

**B.     The government did not lay sufficient foundation for the audio recording played during trial.**

The government argues that the audio recording purporting to contain Ms. Mornyang's voice was sufficiently authenticated.  The government reasons that Mr. Jay both "confirmed that it was [Ms. Mornyang] speaking" and "confirmed that the

9

1   recording was a fair and accurate depiction of Ms. Mornyang's statements[.]" (Gov't

2   Opp., ECF No. 93 at 11.) Mr. Jay's testimony did not got that far. When the

3   government asked him if the recording was a fair and accurate depiction of Ms.

4   Mornyang's statements, Mr. Jay did not confirm that. He instead said that "this is mild

5   to what was going on pretty much for the rest of the five hours of the flight." (Trial

6   Day 2, ECF No. 80 at 98.) This testimony did not clarify how Mr. Jay could

7   authenticate a recording when he did not know when it was recorded, who recorded it,

8   or how he knew it was Ms. Mornyang's voice. Even if Mr. Jay heard the audio

9   recording before trial, which the government argues, it was still necessary to make the

10  "prima facie case that the voice on the tape is in fact [Ms. Mornyang's], whether by

11  means of a witness who recognizes the voice or by other extrinsic evidence." *United

12  States v. Gadson*, 763 F.3d 1189, 1204 (9th Cir. 2014).

13       In arguing that this recording was not prejudicial, the government argues that

14  there was other evidence of Ms. Mornyang's crude and disruptive language. (Gov't

15  Opp., ECF 93 at 12–13.) This misses the point. There was no other evidence

16  purporting to come straight from Ms. Mornyang's mouth. With two eye witnesses

17  claiming they saw no slap, anything that evinced Ms. Mornyang's state of mind and

18  behavior at the time of the alleged offense could disproportionately tip the scales

19  against her. The prejudicial nature of the recording is perhaps the precise reason why

20  the government did not rely on the other evidence of Ms. Mornyang's statements alone.

### III.   CONCLUSION

21

22       The government failed to show that venue was proper in this district. Even if

23  venue were proper here, the interests of justice require a new trial.

24  */ / /*

25

26

27

28

1

2

3

4

5    DATED:  May 24, 2019

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

HILARY POTASHNER
Federal Public Defender


By  */s/ ERIN MURPHY*

ERIN MURPHY
Deputy Federal Public Defender
Attorney for ADAU MORNYANG


By  */s/ GEORGINA WAKEFIELD*

GEORGINA WAKEFIELD

Deputy Federal Public Defenders
Attorneys for ADAU MORNYANG

11