O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> ADAU AKUI ATEM MORNYANG, <br><br> Defendant. | Case No.: CR 19-00050-CJC <br><br><br> **ORDER DENYING DEFENDANT'S MOTION FOR DISMISSAL OF THE INDICTMENT OR A NEW TRIAL [Dkt. 89]** |

**I. INTRODUCTION**

The government charged Defendant Adau Akui Atem Mornyang with one count of interference with a flight attendant and two counts of assault by striking or beating another person while aboard a flight from Melbourne, Australia to Los Angeles, California.  (Dkt. 17 [Indictment].)  On March 14, 2019, after a two-day trial, a jury

found Defendant guilty of inference with a flight attendant and one count of assault by striking or beating another person. (Dkts. 65, 69.)

Before the Court is Defendant's motion for dismissal of the Indictment or, alternatively, a new trial. (Dkt. 89 [hereinafter "Mot."].) Defendant asserts that venue was not proper in the Central District of California because the government did not show that the conduct charged occurred within this District. Defendant also argues that even if venue was proper, the interests of justice require a new trial because the government did not lay proper foundation for an allegedly prejudicial audio recording of Defendant that was played at trial. For the following reasons, Defendant's motion is **DENIED**.

## II. BACKGROUND

The government charged Defendant with (1) interference with a flight attendant, Romeo Gutierrez, through assault, in violation of 49 U.S.C. § 46504, (2) assault of Mr. Gutierrez "by intentionally striking and beating him, specifically, by slapping [him] in the face with her hand," in violation of 18 U.S.C. § 113(a)(4), and (3) assault of Federal Air Marshal Jeffrey Bolanowski "by intentionally striking him and beating him, specifically by kicking [him]," in violation of 18 U.S.C. § 113(a)(4). (Dkt. 17 [Indictment].) According to the Indictment, these incidents occurred "[o]n or about January 21, 2019, in Los Angeles County, within the Central District of California, and elsewhere, . . . while on an aircraft in the special aircraft jurisdiction of the United States." (*See id*. at 1.)

The evidence at trial showed the following. On January 21, 2019, Defendant was aboard United Airlines Flight 99 from Melbourne, Australia to Los Angeles, California. (Dkt. 78 [Day 2 Transcript] at 27:25–28:1.) Mr. Gutierrez and other flight attendants aboard the flight decided to stop serving Defendant alcohol because they believed she had already ordered several glasses of wine. (Dkt. 80 [Day 1 Transcript] at 23:23–24:5.)

About eight to eight-and-a-half hours into the flight, passengers sitting near Defendant began complaining about her erratic behavior to the flight crew. (*Id*. at 24:6–30, 52:5–53:10.) They said Defendant was yelling obscenities and racial slurs and flailing her arms. (*Id*. at 24:6–26:2.) After learning of these complaints, Mr. Gutierrez went to investigate. (*Id*. at 26:3–11.) He saw and heard Defendant flailing her arms and talking very loudly in her seat. (*Id*. at 56:19–24.) He approached her and asked if there was anything he could do to help her out. (*Id*. at 26:13–19.) According to Mr. Gutierrez, this caused her to become more aggravated. (*Id*. at 27:1–5.) Sometime around then, he looked at his watch and observed that there were approximately five hours left in the fifteen-hour flight. (*Id*. at 53:22–23.) Because there were five hours left, he believed that the airplane "most likely" was "close to Hawaii." (*Id*. at 57:9–20.)

When Mr. Gutierrez was unable to get Defendant to calm down, he attempted to contact the pilot. (*Id*. at 61:23–62:22.) He was unsuccessful. (*Id*.) He then went to the upstairs crew bunk to wake up the flight purser and explain the situation. (*Id*. at 63:11–14.) When he returned to the cabin, he saw Defendant out of her seat and approaching the galley where two bathrooms were located. (*Id*. at 64:6–20.) He asked her to return to her seat. (*Id*. at 65:1–2.) Defendant then began walking backwards in the row, flailing her arms and yelling. (*Id*. at 65:3–19.) Mr. Gutierrez and two other flight attendants attempted to de-escalate the situation. (*Id*.) Mr. Gutierrez believed that at this point, Defendant had been screaming for approximately fifteen to twenty minutes. (*Id*. at 66:10–14.)

When Mr. Gutierrez reached Defendant, he tried to calm her down but to no avail. Defendant threw her socks at passengers and kept putting her face close to their own. (*Id*. at 34:2–8.) She then began pointing at Mr. Gutierrez. (*Id*. at 32:17–23, 34:9–13.) Mr. Gutierrez testified that with her left index finger an inch from his face, Defendant suddenly "smacked [him]." (*Id*.) Twelve rows ahead of the incident, Federal Air

Marshal Jason Jay purportedly witnessed the slap.  (*Id*. at 115:12–13.)  He seized Defendant and escorted her to the back of the plane, where she was placed in handcuffs.  (*Id*. at 94:11–23.)  Mr. Gutierrez had to take a thirty-minute break near the front of the plane to process the incident.  (*Id*. at 38:1–10.)  With Defendant in the back of the plane, flight attendants, including Mr. Gutierrez, could not use the rear galley to prepare services for the other passengers for the remainder of the flight.  (*Id*. at 38:23–39:12.)  According to Mr. Gutierrez and Federal Air Marshal Jay, she continued to yell racial slurs and obscenities for the next five hours.  (*Id*. at 39:2–8, 96:23–97:9.)

Approximately two hours before the plane landed in Los Angeles, Defendant was allowed to use the restroom.  (*Id*. at 99:25–100:3.)  She stayed in the restroom for forty-five minutes and when asked, would not leave.  (*Id*. at 103:1–23.)  Jay and other Federal Air Marshals on the flight had to carry her out.  (*Id*. at 105:11–24.)  While they held her arms and legs, she allegedly kicked Federal Air Marshal Jeffrey Bolanowski in the chest.  (*Id*.)  She remained in the Federal Air Marshals' custody for the remainder of the flight.

During the government's case-in-chief, the government introduced an audio recording allegedly taken of Defendant during the flight.  (*Id*. at 98:7–99:18.)  The recording contained loud, graphic language and racial slurs.  The government introduced the recording through Federal Air Marshal Jay, over the defense's objection for lack of foundation.  (*Id*.)  Jay testified that he had reviewed the contents of the audio recording and had initialed and dated the CD-ROM containing the recording.  (*Id*. at 97:16–98:2.)  He also stated that the statements on the recording were "mild" compared to Defendant's statements during the rest of the flight.  (*Id*. at 98:3–6.)  On cross-examination, Jay testified that he did not make the recording but "believe[d]" that it "came from a passenger" who was seated next to Defendant.  (*Id*. at 102:22–25, 112:5–6.)

//

Following a two-day trial, the jury found Defendant guilty of Counts One and Two, and not guilty of Count Three. (Dkt. 69 [Verdict Form].) At the close of the government's case-in-chief, Defendant raised the issue of venue for the first time. (Dkt. 78 [Day 2 Transcript] at 67:5–16.) She argued that because Mr. Gutierrez testified that the events preceding the slap most likely occurred about five hours before the plane was scheduled to land, the government had not met its burden of showing that venue was proper in the Central District of California. (*See id*.)

## III. DISCUSSION

### A. Venue

The Constitution requires the government to prosecute crimes in the district where they were committed. *See* U.S. Const., art. III, § 2, cl. 3; U.S. Const., amend. VI. "Questions of venue in criminal cases . . . are not merely matters of formal legal procedure." *United States v. Johnson*, 323 U.S. 273, 276 (1944); *see United States v. Lukashov*, 694 F.3d 1107, 1119 (9th Cir. 2012). "They raise deep issues of public policy" and implicate "the fair administration of criminal justice and the public confidence in it." *Johnson*, 323 U.S. at 276. To determine whether venue is proper, the Court must "identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts." *United States v. Rodriguez-Moreno*, 526 U.S. 275, 278 (1999) (citing *United States v. Cabrales,* 524 U.S. 1, 6–7 (1998)).

Defendant here was charged with interference with a flight attendant's duties in violation of 49 U.S.C. § 46504, and assault of another person by striking or beating in violation of 18 U.S.C. § 113(a)(4). (Dkt. 17 [Indictment].) The relevant portion of 49 U.S.C. § 46504 provides:

> An individual on an aircraft in the special aircraft jurisdiction of the United States who, by assaulting . . . a flight crew member or flight attendant of the aircraft, interferes with the performance of the duties of the member or attendant or lessens the ability of the member or attendant to perform those duties, . . . shall be fined under title 18, imprisoned for not more than 20 years, or both.

Relatedly, 18 U.S.C. § 113(a)(4) criminalizes "assault by striking [or] beating" another person within the "special maritime and territorial jurisdiction of the United States." It is the government's burden to prove by a preponderance of the evidence that venue for these charges was proper in the Central District of California. *See Lukashov*, 694 F.3d at 1120 ("Venue is a question of fact that the government must prove by a preponderance of the evidence." (citations omitted)).

### 1. Whether Defendant Waived Challenge to Venue

The government first contends that Defendant waived her challenge to venue by failing to raise it before the close of the government's case. "If a defect in venue is clear on the face of the indictment, a defendant's objection must be raised before the government has completed its case." *United States v. Ruelas-Arreguin*, 219 F.3d 1056, 1060 (9th Cir. 2000). However, "if the venue defect is not evident on the face of the indictment, a defendant may challenge venue in a motion for acquittal at the close of the government's case." *Id*. The government asserts that the Indictment here "makes clear that the basis for venue was the fact that the plane landed in Los Angeles County." (Dkt. 93 [Gov't's Opp'n to Def.'s Mot., hereinafter "Opp'n"] at 5.) Accordingly, it claims that the purported defect in venue was apparent on the Indictment's face and Defendant was required to raise her objection earlier.

The purported defect in venue was not apparent on the face of the Indictment. It is irrelevant whether the Indictment "makes clear" that the basis for venue was the fact that the plane landed in the Central District of California. Defendant challenges venue on the

basis of where the offenses charged occurred—not where the plane landed. While the Indictment alleges that the plane landed in Los Angeles County, it does not specify where the offenses charged occurred. (*See generally* Dkt. 17.) The first sentence of the Indictment merely characterizes the offenses as occurring "[o]n or about January 21, 2019, in Los Angeles County, within the Central District of California, and elsewhere . . . ." (*Id*. at 1.) Because the defect Defendant now raises was not clear on the face of the Indictment, she did not waive her right to raise it.

### 2. Whether Venue Was Proper in Central District of California

The Court next considers whether venue was proper in the Central District of California. The government offers two statutory bases for finding that venue was proper. The Court addresses each one in turn.

The government first argues that venue was proper pursuant to 18 U.S.C. § 3237(a). Section 3237(a) provides:

> Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.
>
> Any offense involving the use of the mails, transportation in interstate or foreign commerce, or the importation of an object or person into the United States is a continuing offense and, except as otherwise expressly provided by enactment of Congress, may be inquired of and prosecuted in any district from, through, or into which such commerce, mail matter, or imported object or person moves.

The government relies on the second provision of Section 3237(a). It argues that Count One—interference with a flight attendant's duties—involved "transportation in interstate or foreign commerce" because it occurred over a span of five hours during an international flight. Accordingly, the government contends that venue was proper "in any

district, from, through, or into which" the plane moved, which included the Central District of California.

The Ninth Circuit recently addressed the application of Section 3237(a) to crimes committed aboard a flight. In *United States v. Lozoya*, the defendant was charged with assault on a flight from Minneapolis to Los Angeles. 920 F.3d 1231, 1233 (9th Cir. 2016). Somewhere over the Great Plains, the passenger sitting behind the defendant allegedly jostled the defendant's seat. *Id*. Later in the flight, the defendant confronted the passenger and hit him in the face, causing him to bleed. *Id*. at 1233–34. The defendant was convicted of simple assault in violation of 18 U.S.C. § 113(a)(5) after a bench trial in the Central District of California, where the flight ultimately landed. *Id*. at 1235–36. On appeal, the Ninth Circuit evaluated whether venue was proper. The court held that the parties could not dispute that the "essential conduct element" of the crime charged was assault. *Id*. at 1239. Because that assault was "brief" and occurred "*entirely* within the jurisdiction of a [different] district," the court held it could not constitute a "continuing offense" under the first provision of Section 3237(a). *Id*. (emphasis in original). The court also held that the second provision of Section 3237(a) did not apply because one passenger's assault of another passenger "had nothing to do with" and "did *not* implicate" interstate or foreign commerce. *Id*. at 1240–41 (emphasis in original).

Relying on *Lozoya*, Defendant contends that the crimes charged here did not implicate interstate commerce under the second provision of Section 3237(a). She argues that like *Lozoya*, the only "essential conduct element" here is assault—the alleged slap of Mr. Gutierrez—which occurred "in an instant" and outside the Central District of California's airspace. (Mot. at 10.) Because that assault did not "itself . . . inherently exploit transportation [or] commerce," Defendant contends the second provision of Section 3237(a) is inapplicable. (Dkt. 94 [Reply] at 8.)

The Court declines to adopt Defendant's narrow characterization of the offenses charged here. Unlike *Lozoya*, which involved a passenger's "brief assault" of another passenger, this action involves a passenger's interference with a flight attendant's duties for hours of a fifteen-hour flight. *See Lozoya*, 920 F.3d at 1239. The evidence at trial showed that Defendant's disruptive behavior began before the alleged slap and continued long after. Passengers near Defendant first complained about her conduct approximately eight to eight-and-a-half hours into the flight. (Dkt. 80 [Day 1 Transcript] at 24:6–30.) After Mr. Gutierrez learned of those complaints, he went to investigate. Instead of performing his normal duties, he was forced to address the situation that Defendant created. When he could not handle it on his own, he attempted to contact the pilot and then, spoke to the flight purser. When he returned to de-escalate the situation with Defendant, she purportedly slapped him. Unlike the victim in *Lozoya*, Mr. Gutierrez was a flight attendant. He had an obligation to ensure the safety of the flight's passengers and to care for them for the duration of the flight. Because of Defendant's conduct, he could not fulfill that obligation for hours. Defendant, although restrained by Federal Air Marshals, continued to utter obscenities and remarks that prevented Mr. Gutierrez and the flight crew from using the back of the plane until it landed in Los Angeles.

Defendant nevertheless contends that the offenses here do not involve transportation in interstate commerce because Defendant's alleged slap was the only "conduct element" charged and any continuing interference with Mr. Gutierrez's duties was merely "incidental or circumstantial" to that slap. (Mot. at 9.) In support of this distinction, Defendant relies in part on the Ninth Circuit's decision in *United States v. Stinson*. In *Stinson*, the court evaluated whether venue for a charge of violent crime in aid of racketeering ("VICAR") was proper under the first provision of Section 3237(a). 647 F.3d 1196, 1204 (9th Cir. 2011). The two defendants, members of the Aryan Brotherhood prison gang, were charged with conspiracy under RICO and two counts of VICAR. The defendants appealed their convictions on the ground that venue for the

VICAR counts was not proper in the Central District of California because the "violent crimes" that formed the basis of those counts occurred in the Northern District of California. In setting forth the framework for analyzing venue under Section 3237(a), the court stated that venue is proper "when an 'essential conduct element' of the offense continues into the charging district." *Id*. at 1204 (citation omitted). However, "when all that occurred in the charging district was a 'circumstance element . . . [that] occurred after the fact of an offense begun and completed by others,'" the offense is not a continuing one for purposes of Section 3237(a). *See id*. (citation omitted).

While the court in *Stinson* drew this distinction between an "essential conduct element" and a "circumstance element," it did not clarify what makes an element "circumstantial" as opposed to conduct-based. Indeed, the distinction did not ultimately matter to the facts of that case. The court looked at the four elements of a charge under VICAR, which include "that the defendant committed a violent crime." *Id*. (citation omitted). Although the actual killings that constituted the "violent crime" occurred in the Northern District of California, the court found that the indictment alleged that the defendants also aided, abetted, or otherwise participated in those killings "within the Central District of California." *Id*. Based on those allegations, the court held that an "essential conduct element of committing a violent crime continued in the Central District" and venue was thus proper under the first provision of Section 3237(a). *Id*.

The two cases on which *Stinson* relied when making the conduct-circumstance distinction are more instructive. The first is *United States v. Cabrales*. In that case, the defendant was charged with laundering money in Florida. At issue was whether venue for the charge was proper under Section 3237(a) in Missouri, where the laundered proceeds were initially generated through the distribution of cocaine, or only in Florida, where the ultimate laundering actually occurred. 524 U.S. 1 (1998). The government contended that venue was proper in Missouri because the first crime—drug trafficking—

is an essential element of the second crime—money laundering. It reasoned that money laundering effectively facilitated the drug trafficking or made it profitable by "impeding its detection." *Id*. at 7. The Supreme Court disagreed. Looking at the plain language of the laundering statutes at issue, it held that they did not proscribe "the anterior criminal conduct that yielded the funds allegedly laundered." *Id*. Rather, that "anterior criminal conduct" was "begun and completed by others" before the conduct charged against the defendant occurred. *Id*. at 8. Because the defendant's alleged conduct—money laundering—occurred entirely within Florida, the court held that the offense was not a continuing one under the first provision of Section 3237(a). *Id*.

The Supreme Court in *Cabrales* never explicitly articulated a distinction between a "circumstance element" and a "conduct element" of an offense. Rather, that terminology came from the Supreme Court's decision one year later in *United States v. Rodriguez-Moreno*. 526 U.S. 275, 279 (1999). In that case, the Supreme Court analyzed the proper venue for a charge of carrying a firearm in relation to a kidnapping, a violation of 18 U.S.C. § 924(c)(1). While the kidnapping occurred in New Jersey, the only place the government proved the defendant had carried a gun was Maryland. The government argued that venue for the Section 924(c)(1) offense was nevertheless proper in New Jersey because it was a "continuing" offense under the first provision of Section 3237(a). The Supreme Court agreed. It reasoned that Section 924(c)(1) identifies two distinct conduct elements: "uses or caries a firearm" and "during and in relation to any crime of violence"—there, the kidnapping. *Id*. at 280. In a footnote, the Supreme Court distinguished its holding from that in *Cabrales*. It stated that in *Cabrales*, it had held that the "existence of criminally generated proceeds was a circumstance element of the offense but the proscribed conduct—defendant's money laundering activity—occurred after the fact of an offense begun and completed by others." *Id*. at 280 n.4 (internal quotation marks omitted) (quoting *Cabrales*, 524 U.S. at 7). By contrast, the "'during

and in relation to' language" of Section 924(c)(1) showed that the underlying kidnapping was a "critical part" of the Section 924(c)(1) offense. *Id*.

The Ninth Circuit in *Lozoya* relied on *Stinson* and *Rodriguez-Moreno* when applying both provisions of Section 3237(a). As noted, the court first determined that the only conduct element of the simple assault charge under 18 U.S.C. § 113(a)(5) was assault. It then reasoned that the fact that the assault occurred on a plane was merely a "jurisdictional" and "circumstance" element that was "incidental [to the charge] and therefore irrelevant for venue purposes." *Lozoya*, 920 F.3d at 1240. Defendant argues that the same reasoning should preclude application of Section 3237(a) here. She contends the only conduct element of the interference charge under 49 U.S.C. § 46504 was assault—the purported slap. Any continued interference with Mr. Gutierrez's duties, she claims was an "incidental or circumstantial element" that should not be considered for venue. (Reply at 9.)

As a threshold matter, the second provision of Section 3237(a) does not require the government to independently show that the offense charged was a "continuing" one. It is the first provision of Section 3237(a) that defines a "continuing offense" as one "begun in one district and completed in another or committed in more than one district." The second provision then articulates specific types of offenses that inherently constitute a "continuing offense." It provides that "any offense involving . . . transportation in interstate or foreign commerce . . . is a continuing offense." *See Lozoya*, 920 F.3d at 1239–40 (analyzing whether the offense was a "continuing" one under the first provision but not the second). For the reasons already stated, the Court finds that the offenses here "involv[ed] . . . transportation in interstate or foreign commerce." Unlike the conduct in *Lozoya*, the conduct here was not just an isolated slap that happened to occur on a plane. It was a series of disruptions that interfered with the ability of a flight attendant to care for and maintain the safety of passengers aboard an international flight.

To the extent the Court must distinguish between the "circumstance" and "conduct" elements of Defendant's offenses—an analysis that the courts in *Stinson* and *Cabrales* did only with respect to the first provision of Section 3237(a)—that distinction fails to support Defendant's position. The statute criminalizing interference with a flight attendant's duties is clear. It states that an individual "who, by assaulting . . . a flight crew member or flight attendant of the aircraft, *interferes with* the performance of the duties of the member or attendant *or lessens* the ability of the member or attendant to perform those duties" shall be subject to imprisonment, fines, or both. 49 U.S.C. § 46504 (emphasis added). Interference with the flight attendant's duties is not some separate, "anterior criminal conduct" like the drug trafficking in *Cabrales*. *See Cabrales*, 524 U.S. at 7. It is the "critical" conduct proscribed under § 46504 and the very essence of this crime. *See Rodriguez-Moreno*, 526 U.S. at 280 n.4; *see also* 49 U.S.C. § 46504 (titled, "Interference with flight crew members and attendants"). Because Defendant's interfering conduct began before the slap and continued over the remainder of the flight, venue was proper in the Central District of California pursuant to the second provision of 18 U.S.C. § 3237(a).

The government also argues that venue was proper pursuant to 18 U.S.C. § 3238. Section 3238 provides that "[t]he trial of all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district in which the offender . . . is arrested or is first brought . . . ." The government asserts that it has shown by a preponderance of the evidence that the offenses here began outside the jurisdiction of the United States. (Opp'n at 7.) It relies exclusively on the testimony of Mr. Gutierrez, who stated that the events preceding the alleged slap occurred when the plane "most likely" was "close to Hawaii." (Dkt. 80 [Day 1 Transcript] at 57:9–20.) The government claims that Mr. Gutierrez's testimony "establishes" that the plane was "not at, in, or over Hawaii—but close to it" when the slap occurred. (Opp'n at 7.)

The evidence at trial failed to establish that the offenses charged began outside the jurisdiction of any particular state or district. Mr. Gutierrez's testimony regarding the timing of Defendant's conduct was less than clear. Mr. Gutierrez testified that he looked at his watch sometime around when Defendant first began displaying erratic behavior. (*Id*. at 26:3–11, 57:9–20.) Based on the time, he testified that they were about five hours from landing in Los Angeles, which "most likely" meant they were "close to Hawaii." (*Id*.) Even if the Court were to assume that Mr. Gutierrez's estimate was accurate, it fails to establish whether the plane was over the high seas or over the District of Hawaii, whose jurisdiction extends well beyond its land masses. (*See* Dkt. 94 Ex. A.) "Most likely" and "close" are not enough to satisfy the government's burden. Accordingly, venue was not proper in the Central District of California under 18 U.S.C. § 3238.

The Court recognizes the importance of prosecuting crimes where they were committed. However, the facts of this case highlight the inherent difficulties in ascertaining venue for crimes committed aboard a flight. Congress expressly extended certain criminal laws to apply to acts aboard an aircraft, whose precise location can be impossible to pinpoint. It defies logic to think that Congress did not intend for those acts to be prosecuted simply because someone on the aircraft failed to determine exactly where the aircraft was when the act occurred. The absurdity of such an application of our venue provisions is particularly apparent here. There can be little dispute that the assault of Mr. Gutierrez and the interference with his duties began either over the high seas or over the District Hawaii, implicating either Section 3238 or the first provision of Section 3237(a). Requiring the government to identify precisely where these events occurred merely hampers the prosecution of serious crimes aboard an international flight.

//

//

### B.  Evidentiary Ruling

Defendant also contends that the Court erred in allowing the government to introduce the audio recording purportedly taken of Defendant during the flight. She claims that Federal Air Marshal Jay's testimony was insufficient to authenticate the recording because he could not identify the passenger who made the recording, when the recording was made, or how he knew it was Defendant's voice in the recording. (Mot. at 11.)  She argues that because the jury's verdict relies on the recording's "foundationless yet explosive evidence," the interests of justice require a new trial. (*Id*. at 12.)

To properly authenticate or identify an item of evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a).  In short, the proponent "must make a prima facie showing of authenticity 'so that a reasonable juror could find in favor of authenticity or identification.'" *United States v. Gadson*, 763 F.3d 1189, 1203 (9th Cir. 2014) (quoting *United States v. Yin*, 935 F.2d 290, 996 (9th Cir. 1991)).  The proponent may authenticate an item through "extrinsic evidence, such as through testimony of a knowledgeable witness." *Id*. (internal citations omitted).  When the item is an audio recording, "a witness with knowledge may testify that the recording is what it purports to be, or is a true and accurate copy of the original." *Id*. at 1203–04.  When the government offers an audio recording of the defendant's voice, "it must also make a prima facie case that the voice on the tape is in fact the defendant's, whether by means of a witness who recognizes the voice or by other extrinsic evidence." *Id*. (citing *United States v. Torres*, 908 F.2d 1417, 1425 (1990)).  The threshold for voice identifications under Rule 901(b)(5), however, is "low." *United States v. Ortiz*, 776 F.3d 1042, 1044–45 (9th Cir. 2015) (citation omitted).  The "identifying witness need only be 'minimally familiar with the voice he identifies.'" *Id*. (citation omitted).

The government made a prima facie showing of the authenticity of the audio recording. Federal Air Marshal Jay testified that he reviewed the audio recording prior to coming to Court. (Dkt. 80 [Day 1 Transcript] at 97:1–98:2.) He initialed and dated the CD-ROM containing the recording the day he reviewed it. (*Id.*) When asked if the recording was a "fair and accurate" representation of Defendant's statements, he responded that "[i]f anything," the statements it captured were "mild [compared] to what was going on pretty much for the rest of the five hours of that flight." (*Id.* at 98:3–6.) Federal Air Marshal Jay was "minimally familiar" with Defendant's voice when he authenticated the recording. He observed Defendant's interactions with the flight crew and the alleged slap, placed her in handcuffs, and supervised her for the remainder of the flight. Accordingly, his testimony identifying the audio recording met the "minimum requirements for authentication." *See Gadson*, 763 F.3d at 1204. Any consideration of the probative value of the recording's "explosive" contents was a matter for the jury. *See id.* at 1204.

//
//

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for dismissal of the Indictment or, in the alternative, a new trial is **DENIED**.[1]

DATED:    June 17, 2019

_____
CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE

---

[1] Defendant asks that the Court order the government to lodge a copy of the PowerPoint presentation it used during closing argument. (Mot. at 7 n.1.) The presentation contained slides that purported to describe elements of the crimes charged in Counts 2 and 3 that were not at issue in the case. Defendant wishes to preserve this issue for any appeal of her convictions. The government is hereby ORDERED to lodge a copy of the PowerPoint presentation with the Court.